IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DARIUS GAINES,

    Petitioner,                       No. CIV S-04-0018 FCD GGH P

    vs.

DARRELL ADAMS, et al.,

    Respondent.                   FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On January 3, 2000, petitioner plead guilty to the following offenses: 1) carjacking (Cal. Penal Code § 215(a)); 2) robbery (Cal. Penal Code § 212.5(b)); 3) assault with force likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)); 4) kidnapping (Cal. Penal Code § 207); 5) false imprisonment (Cal. Penal Code § 236); 6) dissuading a witness (3 counts) (Cal. Penal Code § 136.1); 7) personal use of a firearm during the carjacking (Cal. Penal Code § 12022.5(a)(1)); 8) personal use of a firearm during the robbery (Cal. Penal Code § 12022.5(a)(1)); 9) personal use of a firearm during the kidnapping (Cal. Penal Code § 12022.5(a)(1)). Petitioner was sentenced to 29 years 4 months.

This action is proceeding on the original petition filed January 5, 2003. On June 20, 2004, petitioner's counsel filed a supplemental points and authorities. Petitioner raises the following claims: 1) the trial court failed to obtain a factual basis for petitioner's plea prior to its entry; 2) the trial court failed to advise petitioner of the consequences of his plea bargain; 3) the trial court erred in permitting petitioner to enter a plea bargain which violated the prohibition against double jeopardy; 4) petitioner's sentence violated the prohibition against double jeopardy; 5) ineffective assistance of counsel (3 claims); 6) Miranda[1] violation.

After carefully considering the record, the court recommends that the petition be denied as to the claim that counsel was ineffective for grossly misadvising petitioner as to the terms of his plea, and further denied in all other respects.

II. Antiterrorism and Effective Death Penalty Act

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the

constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

On direct appeal, petitioner's appellate counsel filed a Wende[2] brief. Petitioner himself filed a supplemental brief raising three of the claims raised in this action: 1) the trial court failed to obtain a factual basis for petitioner's plea; 2) double jeopardy violation; and 3) the trial court failed to advise petitioner of the consequences of his plea. Answer, Exhibit A, pp. 2-3. The California Court of Appeal found that petitioner waived these claims by pleading guilty. Id., pp. 3-4. The California Supreme Court denied the petition for review without comment or citation. Answer, Exhibit E.

Petitioner then filed a habeas corpus petition in the California Supreme Court raising all of the claims raised in the instant petition. Answer, Exhibit F. The California Supreme Court denied this petition without comment or citation. Answer, Exhibit G. Accordingly, with the exception of the ineffective assistance claim regarding involuntary plea, because the California Supreme Court did not issue a reasoned opinion addressing the merits of petitioner's claims, this court will conduct an independent review of the record to determine whether the denial of these claims was objectively unreasonable.

No state court held a hearing and found facts with respect to petitioner's claim that his counsel so grossly misadvised petitioner concerning the terms of a plea agreement that the resultant plea was involuntary. Therefore, the ordinary rule that state factual findings are presumed correct and can only be overcome by clear and convincing evidence, see Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004), does not apply here. Rather the court engages in de novo fact finding. Killian v. Poole, 282 F.3d 1204, 1207 (9th Cir. 2002).

\\\\\

---

[2] People v. Wende, 25 Cal. 3d 436, 158 Cal. Rptr. 839 (1979).

4

III. Background

The court will summarize the undisputed background information below.

On May 25, 1999, petitioner, who was 16 years old, and two associates, accosted a woman in the parking lot of her Stockton apartment complex, kidnapping and carjacking her at gunpoint. CT 1-20; 129-137. The victim was forced to obtain money from an ATM machine and then was abandoned on a nearby levee. Id. The victim was also threatened with retaliation if she reported the crimes. Id.

During the criminal proceedings petitioner was represented by Gregory Davenport. Following a fitness hearing, it was determined that petitioner would be prosecuted as an adult rather than a juvenile. August 2, 2005, hearing; Transcript II, pp. 10-12.

IV. Discussion

    A. Claims 5, 6, 7: Ineffective Assistance of Counsel

*Standards for Ineffective Assistance of Counsel*

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690, 104 S. Ct. at 2066. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id., 104 S. Ct. at 2066. "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. Prejudice is found where "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard. Williams v. Taylor, 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:[3]

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
>
> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. See Williams, supra, at 411, 65 S. Ct. 363. Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

Claim 5

> In claim 5, petitioner argues that his counsel was ineffective because he, failed to advise petitioner that the plea bargain required petitioner to plead guilty to charges which were without factual basis. As petitioner was 16 years old at the time of the offense, counsel acting as petitioner's advocate was grossly ineffective for

---

[3] Again, to the extent that this court held an evidentiary hearing on an issue, only the Strickland paradigm is utilized.

6

        failing in his duty to 1) investigate carefully; 2) adequately research the facts and law of the negotiated plea, and 3) by not evaluating and analyzing the nature of each charge in which he advised petitioner to plead guilty to.  As petitioner would not taken the plea bargain if not for counsel's advisement.

Petition, 8.

Much of claim five is a restatement of petitioner's other ineffective assistance of counsel claims.  To the extent claim five raises different grounds, these claims are vague and unsupported.  For example, petitioner does not discuss the investigation counsel allegedly failed to undertake.  Nor does petitioner provide any support for his claim that counsel was ineffective for failing to analyze the nature of each charge.  For these reasons, these claims are without merit.  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

In any event, all pre-plea allegations of trial court or attorney "mistake" or "failure" are waived, including allegations of ineffective assistance of counsel, when a guilty plea is entered, with the exception of ineffective assistance of counsel *directly* related to the decision to enter a guilty plea.  United States v. Bohn, 956 F.2d 208, 209 (9th Cir. 1992).

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

        Claim 6 (Evidentiary Hearing Claim)

In claim 6 petitioner alleges that his counsel misadvised him that, if he accepted the second plea offer, he would serve his sentence at the California Youth Authority (CYA) and be released at the age of 25.  Petitioner argues that had he known that he would actually be required to serve his entire sentence in state prison, he would not have pled guilty.

At the outset, the court observes that petitioner's sentence of 29 years 4 months precluded him from being sent to the CYA 9 (even before the passage of Proposition 21).  At the time he entered his plea, Cal. Welf. & Inst. Code § 1732.6 provided, in relevant part,

> No minor shall be committed to the Youth Authority when he or she is convicted in a criminal action for an offense described in Section 667.5 or subsection (c) of Section 1192.7 of the Penal Code and is sentenced to incarceration for life, an indeterminate period to life, or a determinate period of years such that the maximum number of years of potential confinement when added to the minor's age would exceed 25. In all other cases in which the minor has been convicted in a criminal action, the court shall retain discretion to sentence the minor to the Department of Corrections or to commit the minor to the Youth Authority. Notwithstanding any other provision of law, no person under the age of 16 years shall be housed in any facility under the jurisdiction of the Department of Corrections.[4]

At the time of his plea, Cal. Penal Code § 667.5 provided that kidnapping in violation of Cal. Penal Code § 207(b) was a violent felony. Therefore, petitioner was eligible to be sentenced to the CYA only if his determinate sentence was 9 years. The sentence to which petitioner pled pursuant to his plea bargain, i.e. 29 years 4 months, precluded him being sentenced to the CYA.[5]

To establish that Davenport acted unreasonably, petitioner must show that he grossly mischaracterized the likely outcome of his plea. Doganiere v. United States, 914 F.2d 165, 168 (9th Cir. 1990); Iaea v. Sunn, 800 F.2d 861, 865 (9th Cir. 1986). To establish prejudice,

---

[4] The legislative history confirms that the above wording was in effect at the time of petitioner's plea: 2000 Legislation Proposition 21 rewrote the section, which formerly read: "No minor shall be committed to the Youth Authority when he or she is convicted in a criminal action for an offense described in Section 667.5 or subdivision (c) of Section 1192.7 of the Penal Code and is sentenced to incarceration for life, an indeterminate period to life, or a determinate period of years such that the maximum number of years of potential confinement when added to the minor's age would exceed 25 years. In all other cases in which the minor has been convicted in a criminal action, the court shall retain discretion to sentence the minor to the Department of Corrections or to commit the minor to the Youth Authority. Notwithstanding any other provision of law, no person under the age of 16 years shall be housed in any facility under the jurisdiction of the Department of Corrections."
Legislative Comment to § 1732.6.

Certainly, petitioner's sentence plus his age would exceed 25.

The parties do not argue that Cal. Penal Code § 1170.17, 1170.19 are applicable here in the sense that petitioner could have received a juvenile law outcome.

[5] On March 8, 2000, Cal. Wel. & Inst. Code § 1732.6 and Cal. Penal Code § 667.5 amended. Under these amendments, petitioner would be ineligible to be sentenced to the CYA.

petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 58, 106 S. Ct. 366, 370 (1985).

If true, a representation by Davenport to petitioner that he would serve his sentence at the CYA and be released at the age of 25 would be a gross mischaracterization of the likely outcome of petitioner's plea. As discussed above, the court held an evidentiary hearing addressing this issue. The court will summarize the relevant evidence below.

*Pre-Plea Negotiations*

The pre-plea negotiations which ensued give an important context with which to assess petitioner's state of mind at the time he finally accepted the plea bargain and pled guilty.

During pretrial proceedings, the prosecution offered petitioner a plea bargain of 16 years to life. Id., p. 7. On November 9, Davenport related to the court that his client was considering the offer. Id. at 148. At a November 10, 1999, pretrial hearing, Mr. Davenport stated that petitioner was willing to accept the offer. Reporter's Augmented Transcript, p. 152. At a November 15, 1999, pretrial hearing, Mr. Davenport stated that petitioner now indicated that he would not accept the offer. Id., pp. 159, 166. After this statement, petitioner's mother stood up in court and said that petitioner did not know what was going on:

> Davenport: My client has indicated to me it's his position now that he would not accept the offer. Previously he indicated he didn't want it. We talked to him at length, and he indicated—
>
> Mrs. Gaines [petitioner's mother]: Excuse me, I'm Darius' mother. I would like–need to discuss this with my son because what Davenport tells Darius does not–Darius is not understanding what is going on. I need to talk to Darius what is going on. He's not knowing from what Davenport is telling him.

Id.[6]

\\\\\

---

[6] Evidently, petitioner's mother was the one confused. Petitioner had already told his attorney that he would not accept a life plea.

9

*Acceptance of the Plea*

The record is completely uninformative about what transpired from the day the life plea was rejected to petitioner's next appearance in court.[7] On January 3, 2000, petitioner appeared for what was labeled "jury trial assignment." However, this also appears to have been a last ditch effort to determine if a defendant was willing to plead by accepting a plea bargain. The record does not indicate when petitioner was first made aware of the 29 year, four month opportunity for a plea bargain. The only record made of the proceedings occurred after petitioner indicated that he would accept the plea.

At the January 3, 2000, change of plea hearing the court advised petitioner regarding the terms of his plea:

> The Court: You understand you're going to be entering pleas of guilty to Count 5, carjacking, for a nine year term plus the use of a weapon for 10 years–that's 19 years–you're going to plead to Count 4, robbery, for one year four months consecutive plus the use of a gun for one year four months; you're going to plead to a 245 at the levee for one year, a 207 kidnapping for one year eight months plus a 12022.5(a) use of a gun for one year four months and you're going to plead to 236, false imprisonment for eight months consecutive and three counts of 136.1(c)(1), and that would for an additional three years consecutive, for a total of 29 years four months.
>
> Is that your understanding of the plea negotiations?
>
> [Petitioner]: Yes, sir.
>
> The Court: Now, other than what I have just stated have any other promises been made to you or any threats to make you enter these pleas?
>
> [Petitioner]: No, sir.

RT at 2-3.

> The Court: Have you had sufficient time to discuss the facts of the case and the consequence of the entry of the pleas with your attorney?

---

[7]The court instructed respondent to ascertain whether any record of petitioner's visits by his lawyer existed. According to respondent's information, such records no longer exist.

1       [Petitioner] Yes, sir.

2       *Sentencing*

3       Perhaps not wanting the pled "fish" to jump off the line, prior to entry of
4 judgment, all agreed to immediate sentencing on January 3. Right after the pleas were taken, the
5 Court stated:

6       Technically, Darius, you're entitled to a probation report. We
      know exactly what's going to happen. Do you waive referral to the
7       probation office?

8       The Defendant: Yes.

9 RT 9.

10 During sentencing, the trial judge mentioned no less than nine times that petitioner would be
11 sentenced to "state prison." Petitioner did not say anything on the record.

12       *Petitioner's Testimony*

13       Petitioner testified that between the November 15, 1999, hearing, and the January
14 3, 2000, hearing, Davenport did not visit him at the juvenile facility and discuss the new plea
15 offer. July 26, 2005, evidentiary hearing transcript, p. 28. Immediately prior to the January 3,
16 2000, hearing, petitioner was taken into a conference room in the courthouse where Davenport
17 presented him with the plea offer. Id., p. 29. Petitioner's girlfriend, Lawanda Jordan, was also
18 present. Id., p. 30. At that time, she and petitioner had a baby daughter together. Id., pp. 29-30.
19 Petitioner testified that Davenport told him that if he accepted the offer of 29 years 4 months, he
20 would go to CYA and he could be released by the time he was 18, but that he would be released
21 by the time he was 25. Id., p. 30. Jordan told petitioner the same thing. Id. Jordan told
22 petitioner that they had a daughter together and that he would be out by the time he was 25. Id.
23 They discussed the plea for 30 to 45 minutes. Id., p. 51. This was the first time petitioner was
24 aware of the offer. Id.

25       Petitioner was sentenced the same day he accepted the plea bargain. After the
26 judge sentenced him to 29 years 4 months in state prison, petitioner asked Davenport what the

11

judge was talking about. Id., p. 32. Davenport told him that he would still go to CYA and that if they had not picked him up within the next month, petitioner would come back to court. Id., p. 33.

Regarding the first offer of 16 to life, petitioner testified that Davenport told him that he would serve 16 years and then be paroled. Id., p. 41. Petitioner's stepfather advised him that a life term meant that he would spend the rest of his life in prison. Id., p. 42. Petitioner told this to Davenport, but he again told petitioner that he would only serve 16 years. Id., p. 42. Petitioner testified that he was prepared to accept the offer of 16 to life until his mother stood up in court and said that he did not understand the terms of the plea. Id., p. 43. [However, the court record demonstrates to the contrary.]   At some point, Davenport explained to petitioner that if he went to trial and was found guilty, the maximum sentence he could receive was life. Id., p. 57. Petitioner testified that prior to this time, Davenport told him that anywhere from 5 to 6 years would be a good deal. Id., p. 24.

*Cassandra Moore's Testimony*

Petitioner's mother, Cassandra Moore, testified that she attended all of petitioner's hearings except for the January 3, 2000, hearing. Id., p. 66. Moore did not attend the January 3, 2000, hearing because she was on the verge of losing her job. Id., p. 66. She did not know that petitioner was going to accept a plea offer on that date. Id., p. 67.

Mrs. Moore testified that in November, Davenport told her that petitioner would serve his time in the CYA. Id., p. 69. After the January 3, 2000, hearing, petitioner's girlfriend informed Mrs. Moore that petitioner had been sentenced. Id., p. 71. When Mrs. Moore discovered that petitioner had been sent to state prison, she called Davenport. Id., p. 72. Davenport did not return her calls. Id.  However, she overheard her husband have a heated discussion with Davenport after petitioner was sentenced regarding him being sent to state prison. Id., p. 73.

\\\\\

*Lawanda Jordan's Testimony*

Petitioner's former girlfriend, Lawanda Jordan, testified that on January 3, 2000, she was standing outside the courtroom when Davenport approached her. Id., at 92. In January 2000 she was 15 years old. Id., p. 88. Davenport asked her if she told petitioner to take a deal, would he take it. Id. Jordan told him that if the deal involved life, petitioner was not going to take it. Id. Earlier that day, Jordan had heard the attorneys discussing a life sentence for petitioner in the courtroom. Id. Davenport asked her if she thought petitioner would take a deal for less than life. Id., p. 93. Jordan said she thought petitioner would accept such an offer. Id. Davenport told her to wait while he spoke with the judge. Id. When Davenport returned, he told her that petitioner would not have a life sentence, and he would make sure that petitioner got out by the time he was 25. Id., pp. 93-94. Davenport told Jordan that petitioner would be out to help raise their daughter. Id., p. 94.

Davenport then told Jordan that petitioner would have to plead to 29 years but he would be out by the time he was 25. Id. Davenport told Jordan to tell petitioner that she would marry him and that she would stick by him and that they would stay in contact. Id. Jordan and Davenport went into a room where petitioner was sitting at a table. Id., p. 95. Jordan told petitioner to take the 29 years, and that he was going to a youth program and would be out by the time he was 25. Id. Jordan told petitioner that she would marry him and that he was going to help raise the baby. Id. Petitioner began to cry. Id. Jordan could not remember what Davenport said during this meeting. Id. A bailiff was sitting by the door. Id.

A few months after January 3, 2000, Jordan learned that petitioner had been sent to state prison. Id., p. 96. She lost contact with petitioner and moved to Indianapolis, which is where she traveled from for the evidentiary hearing. Id., pp. 96-97.

*Gregory Davenport's Testimony*

At the evidentiary hearing, Davenport testified that the January 3, 2000, plea offer was for petitioner to serve a sentence of 29 years 4 months. Transcript from August 2, 2005,

13

hearing, p. 4. With respect to where petitioner would serve his sentence, Davenport testified that there was some question as to where petitioner would initially serve his sentence because he was under 18 years old. <u>Id</u>. Davenport told petitioner that because he was a juvenile, he did not believe that he would be immediately placed in an adult facility. <u>Id</u>. Once petitioner reached 18, there was no proscription against putting him in state prison. <u>Id</u>., pp. 4-5. Davenport told petitioner that he would have to serve around 85% of his sentence before being released. <u>Id</u>. He told petitioner that he would not be released until he was 35 to 40 years old. <u>Id</u>.

Davenport testified that the prosecutor always took the position that the charges against petitioner were very serious. <u>Id</u>., p. 6. Prior to the offer of 29 years 4 months, the prosecutor did not make an offer for less than a life sentence. <u>Id</u>. With respect to the initial offer of 16 to life, Davenport told petitioner that he would have to serve 16 years before becoming eligible for parole. <u>Id</u>., p. 7. It was Davenport's understanding then that people with life terms almost never got parole. <u>Id</u>. Davenport testified that he would not have described the 16 to life sentence to petitioner as meaning that he would serve 16 years and then be out of prison. <u>Id</u>.

At some point during his representation of petitioner, Davenport told him that he did not have a good chance of prevailing at a jury trial due to the strength of the evidence against him. <u>Id</u>., p. 8. Davenport initially advised petitioner that if he were found guilty, it was probable that he would receive a life sentence. <u>Id</u>., p. 9. Davenport never conveyed a plea offer or a personal evaluation of a possible sentence to petitioner that involved a sentence where he would be released at the age of 18 or 25. <u>Id</u>., p. 11. Davenport testified that if petitioner had been found fit to be prosecuted as a juvenile, the longest sentence he could have received was incarceration in CYA until he was 25 years old. <u>Id</u>., p. 13.

Davenport testified that when he discussed the offer of 29 years 4 months with petitioner, he could not recall Jordan being present. <u>Id</u>., p. 23. Davenport denied asking Jordan to tell petitioner that she would marry him if he accepted the offer. <u>Id</u>., p. 24. Davenport

\\\\\

14

testified that did not recall "enlisting the help of anybody to coerce" petitioner into doing anything. Id.

At the evidentiary hearing, petitioner's counsel questioned Davenport regarding the law in effect on January 3, 2000, regarding petitioner's eligibility to be sentenced to the CYA. It appears that both petitioner's counsel here and Davenport had a misunderstanding of that law. Petitioner's counsel and Davenport seemed to agree that the court in this case could have sentenced petitioner to CYA, despite the terms of the agreement. Id., p. 51. As discussed above, the length of petitioner's sentence precluded the judge from exercising any discretion to send petitioner to the CYA for any portion of his sentence. Cal. Welf. & Inst. Code § 1732.6 (1999).

Davenport had a very vague recollection of discussing the offer of 29 years 4 months with petitioner in the juvenile facility where petitioner was housed as well as in the court house. August 2, 2005, evidentiary hearing transcript, p. 76. Davenport also could not recall telling petitioner's mother that he would be committed to the CYA. Id., p. 49.

Davenport did not recall asking Jordan to go into a jury room to talk to petitioner about the plea offer. Id., p. 69. Davenport testified that this was not something that the bailiffs of San Joaquin County, in his experience, would have allowed. Id., p. 70. The bailiffs would have allowed such a conversation in open court near a jury box but would not have permitted it in an unmonitored jury room. Id. However, according to Davenport, the bailiffs "routinely" allowed such conversations if they were allowed to go into the room also. Id.

Following the evidentiary hearing, the court ordered respondent to contact the jail officials in an attempt to obtain records to corroborate Davenport's testimony regarding his visits with petitioner. Respondent was unable to obtain these records. In the alternative, respondent submitted a time sheet from Davenport. This document does not contain specific information regarding Davenport's jail visits.

\\\\\

\\\\\

*Discussion*

If petitioner and Jordan are to be believed, on January 3, 2000, Davenport told petitioner that if he pled to 29 years 4 months he would be sent to CYA and released at the age of 25. If Davenport is to be believed, he told petitioner that the offer was for a determinate term of 29 years 4 months in state prison, with the possibility that petitioner would serve his sentence in the CYA until his eighteenth birthday.

Petitioner's statement to the court that he understood that he would be sentenced to 29 years 4 months, with no mention of CYA, or even a lesser term, carries a strong presumption of veracity. Blackledge v. Allison, 431 U.S. 63, 74, 97 S. Ct. 1621 (1977). It stands to reason that anyone who had his life being played out for him would have insisted that there be some comment about the "real time" to be served. Yet, petitioner hesitated not a whit when asked if he understood that he would be sentenced to 29 years. Petitioner affirmed that he had been given sufficient time to consider the consequences of the plea.[8] Petitioner had himself exercised control when he refused to enter into a life plea that he had previously accepted. Petitioner knew what the stakes were, knew that the prosecution had a strong case, and knew that the prosecution had no reason to "cave" on their strong position.[9]

In order to find for petitioner, the court would have to find that Davenport deliberately misrepresented to petitioner what the sentence would actually be. While there may have been some confusion over the potential in the law for a discretionary sentence to CYA *following trial,* no confusion existed that the prosecution had not offered such in a plea deal even

---

[8] However, this court is also mindful that petitioner was only 16 years old at the time he entered his plea. Petitioner's youth casts doubt on this presumption. See Haley v. Ohio, 332 U.S. 596, 599, 68 S.Ct. 302 (1949) ("when, as here, a mere child–an easy victim of the law–is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity."). However, the record does not indicate immaturity on petitioner's part.

[9] The facts, including petitioner's confession to the police, were four square against petitioner. The case was as acquittal proof as any case could be.

if it were technically available.  Davenport would have to possess a state of mind that he so desperately sought a plea that he would actually misrepresent to his client the fact that the real sentence was 29 years.  Davenport would have had to know that petitioner would answer the court's questions so clearly and without hesitation such that his malfeasance would not be discovered.  The undersigned does not find from the record or the testimony that Davenport possessed such a state of mind, or that Davenport was capable of doing such a thing to his client.

Moreover, under petitioner's theory, from what Davenport told him, he would have to be savvy enough to understand that a sentence to CYA meant that he would serve no more than nine years.  Yet, petitioner made not a squeak on the record (only to his lawyer) when he did not hear that he was being sentenced to CYA.  This is not probable.

The undersigned does not reach his conclusion without some doubts.  Lawanda Jordan had no apparent stake in the outcome of these proceedings.  Although she and petitioner had a child together, shortly after his incarceration, they lost contact and she moved to Indianapolis.  Her testimony at the evidentiary hearing appeared credible and uncoached.  Jordan testified that she, petitioner and Davenport discussed the plea offer in a room while a bailiff stood by, a practice which Davenport testified happened routinely.  She clearly testified that Davenport told her to tell petitioner that he would be released at the age of 25 so that they could raise their baby together.  According to Jordan, this offer was made on January 3, 2000, after Davenport informed the judge that petitioner would not accept a term less than life.  This testimony also supported petitioner's claim that Davenport had not discussed this offer with him prior to that date.

Perhaps confusion was caused by discussion about where petitioner might be initially housed, as opposed to sentenced to.  But the point is, there could be no realistic expectation or confusion that the prosecution, which was holding out for the longest time for a life term, would cut their position so radically.  Jordan made the evidentiary hearing close, but "close" does not cross over the preponderance hurdle.

The claim should be denied.

Claim 7

In claim 7, petitioner alleges that counsel failed to file a motion to suppress based on a violation of Miranda. In Tollett v. Henderson, 411 U.S. 258, 93 S. Ct. 1602 (1973), the Supreme Court held that a defendant who pleads guilty may not thereafter raise claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. 411 U.S. at 267, 93 S. Ct. at 1608. A criminal defendant may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was constitutionally inadequate. Id. Pursuant to Tollett, petitioner's claim alleging ineffective assistance of counsel based on counsel's failure to file a motion to suppress is barred because it does not implicate the voluntariness of his plea. See also United States v. Bohn, supra.

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

B. Claim 1: Trial Court's Failure to Obtain Factual Basis for Plea

Petitioner argues that the trial court failed to recite a factual basis for his plea, rendering his plea involuntary and uninformed. This claim is barred pursuant to Tollett, supra, as it does not implicate the voluntariness of petitioner's plea based on ineffective assistance of counsel.[10]

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established

---

[10] Petitioner acknowledges that in McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166 (1969), the Supreme Court explained that the Federal Rules of Criminal Procedures, Rule 11, requiring a factual recitation sufficient to sustain a conviction prior to acceptance of a guilty plea, "has not been held to be constitutionally mandated, [but] is designed to assist the district judge in making the constitutionally required determined that a defendant's plea is truly voluntary." June 30, 2004, supplemental brief, pp. 14-15. Pursuant to McCarthy v. United States, this court would find no clearly established Supreme Court authority holding that pleas are involuntary and unknowing if the trial court failed to recite the factual basis of the plea.

Supreme Court authority. Accordingly, this claim should be denied.

### C. Claim 2: Trial Court Failed to Adequately Advise Petitioner of his Sentence

Petitioner argues that the trial court failed to advise him that he would serve his sentence at the California Youth Authority. This claim begs the issue already adjudicated after evidentiary hearing. There was no reason for the trial court to advise petitioner about a sentence at CYA because the plea bargain did not envision such – and the judge knew it. To the extent that petitioner is simply claiming that he should have been informed that he would be initially housed at CYA, petitioner does not cite any authority that such advisement is necessary for a constitutionally valid guilty plea.

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

### D. Claim 3, 4: Double Jeopardy

Petitioner argues that his conviction for both kidnapping and the lesser included offense of false imprisonment violated the Double Jeopardy Clause because both charges were based on the same uninterrupted period of detention. Petitioner also argues that his convictions for three separate counts of dissuading a victim violated the Double Jeopardy Clause because the record showed that several threats were made with the single aim of dissuading the victim.

When a defendant's double jeopardy claim depends on an undeveloped factual record, it is waived by a guilty plea. United States v. Broce, 488 U.S. 563, 575, 109 S. Ct. 757, 765 (1989). A guilty plea does not waive a claim that the charge, judged on its face, is one which the state may not constitutionally prosecute. Id.

Both of petitioner's claims require an examination of the factual record. In other words, these claims are not based on an argument that the charges, on their face, violated the Double Jeopardy Clause. Accordingly, petitioner's guilty plea waives these claims.

\\\\\

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

E.  Claim 8: Miranda Violation

Petitioner argues that his rights pursuant to Miranda were violated during an interrogation.  Because this claim does not implicate the voluntariness of petitioner's plea based on ineffective assistance of counsel, it is barred pursuant to Tollett, supra.

After independently reviewing the record, the court finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be denied in all respects.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 9/18/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
gaines.157